(73 App. Div. 363.)

### HOES v. NEW YORK, N. H. & H. R. CO.

(Supreme Court, Appellate Division, First Department.   June 13, 1902.)

1. RAILROADS—INJURY TO ENGINEER—EVIDENCE—SUFFICIENCY.
    Evidence examined, and *held* sufficient to show that the negligence of defendant's engineer caused a collision, and that defendant was liable for the death of one of the engineers therein.

2. DEATH—ACTION—PARTIES—PUBLIC ADMINISTRATOR.
    Under the statute of Connecticut, declaring that actions for death shall survive to the executor or administrator, the public administrator in New York, having taken out letters on the estate of a resident of Connecticut, could maintain an action for the latter's death.

3. SAME—JURISDICTION.
    Discretion of a trial court in assuming jurisdiction of an action by the public administrator for the death of a nonresident killed in a foreign state will not be disturbed on appeal after final judgment.

4. SAME—PARTIES—ADMINISTRATOR—APPOINTMENT—COLLATERAL ATTACK.
    In an action by the public administrator for the death of a nonresident killed in a foreign state, defendants set up that property of deceased was brought into the state and administration taken out for the sole purpose of bringing the action; but the order of the surrogate recited that deceased died "leaving assets within the state" for which administration is granted. *Held*, that it would be presumed that the surrogate had proof of the fact recited, and the appointment is not subject to the collateral attack.
    Van Brunt, P. J., and Laughlin, J., dissenting.

Appeal from trial term.

Action by William H. Hoes, public administrator, against the New York, New Haven & Hartford Railroad Company. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Affirmed.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGHLIN, O'BRIEN, and INGRAHAM, JJ.

Henry S. Wardner, for appellant.
Thomas P. Wickes, for respondent.

O'BRIEN, J.   This action was brought under a Connecticut statute to recover damages for negligence which resulted in the death of one George Dean.   It is alleged in the complaint that the defendant is a foreign corporation, organized and existing under the laws of the state of Connecticut.   Bean was a locomotive engineer in the employment of the defendant, and while running a freight train on the defendant's line of railway in the state of Connecticut he was killed in a collision with another freight train.   We have carefully examined the record, and do not find error calling for a reversal of the judgment, either in the admission or rejection of evidence, or in the instructions given by the trial judge to the jury, or in the refusal of the judge to charge any of the requests made by the defendant's counsel; nor upon the questions of defendant's negligence and the freedom of the deceased from contributory negligence do we find, upon reviewing the testimony, any reason for disturbing the verdict.

The accident occurred at about 6:48 o'clock on a foggy morning, midway between the stations of Towantic and Osborntown, which are about three miles apart; Dean being the engineer on the east-bound freight train, known as "Second 232" from Towantic, and Mott, the conductor. The west-bound train from Osborntown was half of the train known as "207" and was in charge of Engineer Hickey. The conductor of 207 (Frank) had been left by Hickey with the front half of the train on the siding at Towantic, and at the time of the accident was on the engine with Dean, returning to Osborntown to take charge of the second half of 207, which he supposed would remain on the siding there until his arrival, thus allowing second 232 free passage. Frank's testimony is: That he had arrived with train 207 at Osborntown, and attempted to make the upgrade to Towantic, but found it impossible, and backed his heavy train to the Osborntown siding, and then entered the station, where there was no operator so early in the day, and telegraphed himself to the general train dispatcher at Hartford of his difficulty; and the answer was, "If I would make arrangements to flag second 232 back to Osborntown by my rear end, that he would give me a meet order on second 232 at Towantic," and he then received and wrote down the following order from the general train dispatcher: "Second 232, Eng. 1056, and No. 207, Eng. 1057, will meet at Towantic"; and he gave to his engineer (Hickey) a copy of this order, and told him "he would take our head end to Towantic and flag second 232 back to Osborntown." That he did not think Hickey responded, but he did not say he would not carry out the order. This is practically the only disputed point in the case; Hickey testifying that, when Frank told him of the plan to flag second 232 to Osborntown after the first half of 207 had been taken to Towantic, he told him he would not do it. In so refusing, it appears Hickey might have been justified; for, although the conductor was his superior officer, the rules provided that orders should be in writing, and in all cases the engineer was given discretion in protecting the company's property. The first half of 207 proceeded to Towantic siding, and Hickey they ran the engine back to Osborntown. A few moments later Dean's train, second 232, arrived at Towantic, and the telegraph operator there gave to Dean two orders, one of which was identical with the order Frank and Hickey had received at Osborntown, namely, "second 232, Eng. 1057, and No. 207, Eng. 1057, will meet at Towantic," and the other an order that "second 232, Eng. 1056, extra 1011 west, and No. 211, Eng. 1056, will meet at Meriden Jct.;" the latter place being east of Osborntown. These orders from the general train dispatcher state, "Conductor and engineer must each have a copy of this order;" and duplicates were found upon Dean after the accident, which bear signatures purporting to be those of Mott and Dean. Mott testifies, however, that he was not given the orders by the operator, and never saw them. Frank testified that he spoke to Dean at Towantic, and told him of the plan to flag down to Osborntown, and there pass the other half of 207, and Dean said, "All right," and Frank got on the engine to flag down with him. Just before Dean pulled out of

Towantic, the operator received from the general train dispatcher the following order: "Release second 232,"—and accordingly the block signal was then changed, indicating a clear track ahead. This order, apparently, was not given to either Dean or Mott; but the latter says that, as the train went out, he saw that the block signal was clear. A few minutes later the two trains rushed together in the fog, and Dean was killed.

We think that the evidence justifies the conclusion that the accident occurred solely through the neglect of the general train dispatcher in sending the release order, by which the block signal was made to indicate a clear track, without having previously sent written orders to both trains that the second half of 207 was to remain at Osborntown until 232 had passed, and been assured that such orders were duly received and understood. Both engineers had been given written orders to meet at Towantic, and Hickey was endeavoring to carry this order out. Dean arrived at Towantic, to find a train on the siding and to receive orders to meet a train at Meriden Junction, further east; and, although Frank gave him instructions that 232 was to be flagged to Osborntown, he was justified, independently of such information, in proceeding when the telegraph operator indicated by the signal a clear track ahead, which was done in response to the release order. In other words, the jury were justified in finding that, however negligent were the acts of Hickey in not doing as his conductor told him, of Frank in giving directions without written order, of the operator in handing both the Towantic orders to Dean instead of giving copies to Mott, of Mott in not insisting upon receiving such orders and assuming the initiative in the management of his train, or of Dean in accepting the papers and going ahead without direction from Mott, the real and sole negligence which related to and caused the accident was the negligence of the train dispatcher in giving the release order, which resulted in the block signal being changed to indicate a free track, before he had given the customary orders in writing that the half of train 207 should remain at Osborntown, and he knew such orders were accepted. That the defendant is liable for such negligence on the part of its train dispatcher is fairly established; and the rule of law applicable is well expressed in the case of Hankins v. Railroad Co., 142 N. Y. 416, 37 N. E. 466, 25 L. R. A. 396, 40 Am. St. Rep. 616, in the following language:

"If the defendant owed a duty as master to give correct orders to these trains, or at least to take due and reasonable care to give them, the failure to perform that duty is the failure of the master in his character as such, although he intrusted the performance of the duty to the train dispatcher. * * * When the train dispatcher originates and promulgates such orders as were given in this case, he is acting as the master, or, as it is said, his alter ego, and the master is liable for the negligence of the agent he has employed to do his (the master's) particular work."

Two objections are taken, however, to the right of the plaintiff to recover. The first relates to the legal capacity of the plaintiff to sue, and it is argued that a public administrator has not capacity as such to maintain an action of this character, as it is in no way connected with any of the objects for which letters of administration are granted

to him as an official. It is doubtful if this objection can be considered on this appeal, for the reason that it does not appear to have been taken by answer or demurrer, and ordinarily, therefore, must be regarded as waived. If, however, the question is properly raised, we do not think it would be fatal to the plaintiff's right to maintain the action. It will be noticed that there is a marked distinction between the statutes giving the right of action for injuries causing death. By the statute of our state the right is conferred upon an administrator for the benefit of the next of kin, while the statute of Connecticut reads:

"All actions for injury to the person, whether the same do or do not instantaneously or otherwise result in death, * * * shall survive to his executor or administrator."

Under the Connecticut statute, therefore, the recovery would be an asset of the estate of the deceased, precisely as any other claim which he might have at his death. It would be governed by the same rules that would have applied to an action if it had been brought by the deceased in his lifetime and prosecuted to judgment. The claim being, therefore, an asset of the estate, the public administrator could bring the action to recover it.

Although the public administrator has thus legal capacity to sue for such a cause of action, the more serious inquiry is whether our courts will entertain jurisdiction. The accident happened in a foreign state, where the deceased resided; and there is authority in favor of the view that the representatives of his estate should be required to enforce their rights in the courts of that state. Ferguson v. Neilson (Sup.) 11 N. Y. Supp. 524; Burdick v. Freeman, 46 Hun, 138. Although, therefore, the court has jurisdiction, it could refuse to entertain the action. The court, however, did not so refuse, but proceeded to try the case, and all the reasons ordinarily presented for refusing to retain the action and proceed with it, as that our courts should not be vexed with litigation arising between residents of another state, and that our citizens should not be delayed by actions which should be tried in the courts of another jurisdiction, are wanting where the whole case has been tried and a verdict rendered. We think, therefore, that at this stage of the litigation, after judgment entered, the discretion exercised by the court in entertaining the action should not be disturbed.

In regard to the second objection, the defendant being a foreign corporation, the decedent having been a nonresident, and the collision which resulted in his death having occurred in the state of Connecticut, jurisdiction of the action could not have been acquired, unless it was brought by a qualified resident plaintiff. An administrator appointed in the state of Connecticut could not have sued the defendant here. Robinson v. Navigation Co., 112 N. Y. 315, 19 N. E. 625, 2 L. R. A. 636. It is set up in the answer that the surrogate of the county of New York had no jurisdiction to appoint the plaintiff administrator, for the reason that such appointment was without jurisdiction, illegal, and without authority of law, and of no effect. To sustain this allegation of the answer, it was shown at the trial that a brother-in-law of the deceased, Dean, a few months after Dean's death, brought from the state of Connecticut into the state of New York a watch, the property of Dean, of the value of

$25, and he also testified that he was told by an attorney to bring that watch into the state to give foundation for making an application for letters of administration, so that this suit could be brought here, instead of in Connecticut. It is argued from this that the letters of administration were granted under that provision of subdivision 2 of section 2476 of the Code of Civil Procedure which gives to the surrogate of each county exclusive jurisdiction to grant letters of administration where a decedent, not being a resident of the state, died without the state leaving personal property which has since his death come into "that county" and remains unadministered. It is strenuously argued that the record thus shows that the letters of administration were procured by an imposition upon the court; that the parties at whose instance and for whose benefit this action was instituted perpetrated a fraud in procuring a status for a qualified plaintiff to bring this action; that the fraud consisted in concealing from the surrogate the ultimate purpose of the application for letters of administration, there being no occasion for the issuance of such letters for any reason or object connected with the legitimate purposes of administration of an estate. If a fraud were really perpetrated upon the surrogate's court, and if the action of the surrogate in granting the letters had been invoked upon allegations that assets of a decedent had come within the county since his death and remained unadministered, and that had been the ground upon which the letters were issued, we would have presented a case which would require us to determine whether the decree of the surrogate granting letters can be attacked collaterally in this action, and perhaps we could find authority for the affirmative of that proposition. But, notwithstanding the evidence to which reference has been made, it does not appear in the proofs that the surrogate granted the letters to the plaintiff under the particular provision of the Code above mentioned. The jurisdiction of the surrogate to grant such letters, by the third subdivision of section 2476 of the Code, also exists in cases where the decedent, not being a resident of the state, died without the state leaving personal property within the county in which the application for letters is made. The letters of administration issued to the plaintiff recite that:

"Whereas, said George Dean, late of the state of Connecticut, departed this life intestate on the 12th day of March, 1899, not being at or immediately previous to his death an inhabitant of the county of New York. but leaving assets therein, by means whereof the ordering and granting administration of all and singular the goods, chattels, credits, etc., doth appertain to us."

Here, then, the ground upon which the letters were issued is that the decedent died leaving assets in the county. It must be presumed that the surrogate had proof before him of the facts which gave him jurisdiction, and that the letters, therefore, were not issued in consequence of the fraud upon which the defendant relies to invalidate those letters. In Leonard v. Navigation Co., 84 N. Y. 48, 38 Am. Rep. 491, which was an action against a foreign corporation similar to this, it was held that letters of administration granted by a surrogate in this state, where the intestate died leaving assets in this state. are conclusive as to authority to bring such action, and

that where the letters on their face show that the intestate died leaving assets in the state and in the county of New York, that gave the surrogate of the county of New York jurisdiction. Even if the action of the surrogate in granting letters could be collaterally attacked, we cannot assume, in contradiction of the letters, that he was without proof of the fact upon which the jurisdiction to issue the letters was based, or that he issued those letters upon facts differing from those stated in the letters. Again, assuming that the action of the surrogate in issuing the letters may be collaterally attacked, the proof falls short of showing that the application for such letters was in reality founded upon the bringing of an insignificant piece of property formerly belonging to the decedent within the county. If such were the fact, and the surrogate had been imposed upon, he doubtless in a direct application would have no hesitation in revoking the letters. In the face of the recital in the letters, we cannot adjudge otherwise than that such letters were duly and properly issued, and are not subject to impeachment in this action.

We have thus proceeded as though the question of fraud or collusion was sufficiently raised by the answer. Here again, however, it is doubtful if allegations that the appointment was "without jurisdiction, illegal, and without authority of law" are equivalent to allegations that the appointment was obtained by fraud or collusion. Excepting these under section 2473 of the Code of Civil Procedure, where the jurisdiction of a surrogate's court to appoint an administrator is drawn in question collaterally, "the jurisdiction" of that court to make the appointment is conclusively established by an allegation of the jurisdictional facts contained in a "written petition * * * used in the surrogate's court."

We think that the judgment and order appealed from must be affirmed, with costs. All concur, except VAN BRUNT, P. J., and McLAUGHLIN, J., who dissent.